

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS

## AUSTIN

GERALD C. MANN
ATTORNEY-GENERAL

Honorable H. L. Washburn
County Auditor
Harris County
Houston, Texas

Dear Sir:

> Opinion No. 0-4529
> Re: Authority of county to sup-
> port and maintain Office of
> Director of Civilian Defense.

We have your letter of April 9th, which we quote:

"On September 8, 1939, the President, by an executive order, Number 8248, created the Office of Emergency Management, the actual creation of that particular office being by an administrative order dated May 25, 1940. On May 20, 1941, by Executive Order Number 8757, the President created the 'Office of Civilian Defense' as a part of the Office of Emergency Management. For convenient reference, I attach a copy of Executive Order Number 8757.

"The Director of the Office of Civilian Defense in turn designated the Governors of the various States as Directors or Coordinators of the defense activities in their several States. In turn, the Governor of Texas appointed the County Judge of Harris County and the Mayors of the fourteen incorporated municipalities in Harris County as 'Coordinators of Civilian Defense, with all of the legal rights and responsibilities appertaining to such positions.' The quoted language is taken from the form of commission issued by the Governor.

"So far as I am informed, the Governor has not issued specific proclamations or other instructions authorizing or directing the various Coordinators appointed in Harris County to adopt

the plan for civilian defense which has been
placed in effect by a tentative and somewhat
loose agreement among the several Coordinators
appointed in Harris County. The County Judge
and the Mayor of the City of Houston, as the
appointed Coordinators of the two largest govern-
mental units in Harris County, have entered in-
to an agreement with the Mayors of the other
municipalities, by which Colonel Ike Ashburn
was appointed Director of Civilian Defense with
general authority to coordinate such defense
activities in Harris County. As I understand
the present arrangement, each of the municipal-
ities involved, with the exception of the Coun-
ty of Harris and the City of Houston, proposes
to direct all of its own expenditures deter-
mined by it to be necessary in connection with
the defense activities. It is further proposed
by the County Judge and the Mayor that the Coun-
ty of Harris and the City of Houston shall con-
tribute funds for the support, operation, and
maintenance of the Office of the Director of
Civilian Defense and to defray the expenses
which are set forth in the budget submitted by
the Director of Civilian Defense, a copy of
which is attached. Generally, the type of ex-
penditure proposed consists of the employment
of the necessary personnel, outlays for tele-
phone lines, expenditures and maintenance of
motor equipment, and the purchase of warning
signals to be installed and maintained by the
Director.

"The suggested method of operating the Of-
fice of the Director of Civilian Defense, and
the activities which will be carried on under
his direction and supervision, is by direct
financial contribution, or, alternatively, by
the contribution of equipment, personnel, and
supplies for the operation and maintenance of
the civilian defense setup. This, therefore,
immediately raises the question of the author-
ity of County officers to contribute funds for
this purpose, or the lending of employees, sup-
plies, and equipment. The proposed course of
action presents to my mind the following ques-
tions which are respectfully submitted to you
for determination:

"(1) May the County legally contribute to the support and maintenance of the Office of the Director of Civilian Defense of Harris County money from its General Fund, or its Road and Bridge Fund, or both, for the payment of the type of expenses outlined in the budget submitted by the Director of Civilian Defense?

"(2) If the County and its officers have such authority, may the County, acting through the Commissioners' Court, enter into a joint contract with the City of Houston, either alone or jointly with the various other municipalities in Harris County, to provide for the operation of the Office of the Director of Civilian Defense, and the contribution of funds for such purpose out of the General Fund and the Road and Bridge Fund?

"(3) If the County may legally enter into such a contract as is suggested in Question (2) above, may the County then pay over its pro rata share of the funds fixed by the contract to the Director for expenditure, or must any such contract provide that expenditures shall be made only in accordance with the laws providing for advertisement for bids, purchases, audits, and other laws regulating the accounting for and expenditure of County funds, such as the Depository Law, et cetera?

"(4) In the event you should be of the opinion that the County may not legally directly contribute money from its General Fund, or its Road and Bridge Fund, as suggested in Question (1) above, may it, without violating the law, acting through the Commissioners' Court and its duly constituted officers, such as the Sheriff, the Assessor and Collector of Taxes, and other similar officers, contribute supplies, machinery, equipment, and personnel for the purpose of operating and maintaining the Office of Civilian Defense, such operation and maintenance to be subject to the direction of the appointed Director for Harris County?

"The object to be accomplished is not only a laudable one, but is undoubtedly a public

matter. It seems to me, however, that the authority of the County officers and the Commissioners' Court, in connection with such matter, is limited. Harris County happens to be situated in a particularly vital area, since it is the seat and center of much work and manufacture directed to the important end of a successful prosecution of the war. It is, as you know, the center of oil activities and the various refineries themselves are at the present time largely engaged in the manufacture of toluol and other ingredients or bases of explosives. There is, therefore, a desirable object to be accomplished by the operation of the Office of Civilian Defense.

"The Commissioners' Court is authorized by the provisions of Article V, Section 18, of the Constitution, which provides in part, as follows:

"'The county commissioners so chosen, with the county judge, as presiding officer, shall compose the County Commissioners Court, which shall exercise such powers and jurisdiction over all county business, as is conferred by this Constitution and the laws of the State, or as may be hereafter prescribed.'

"The general powers of a Commissioners' Court are provided in Article 2351, Vernon's Annotated Texas Statutes. In addition to the general powers there enumerated, there are various special powers enumerated in the statutes which have been passed from time to time. Thus, the Forty-Seventh Legislature passed an act which is now carried as Article 2351a-1, Vernon's Annotated Texas Statutes, which authorizes the County Commissioners' Court to 'furnish fire protection and fire fighting equipment to the citizens of such county residing outside the city limits of any city, town, or village within the county and/or adjoining counties.' This statute specifically authorizes the Commissioners' Court to make contracts with 'any city, town, or village within the county and/or adjoining counties, upon such terms and conditions as shall be agreed upon between the Commissioners' Court and the governing body of

such city, town, or village, for the use of the
fire trucks and other fire fighting equipment of
the city, town, or village.' The act concludes
with a proviso reading:

"'Provided, however, that any fire equip-
ment purchased by any County shall be done only
by a majority vote of property owning taxpayers
and qualified voters of such county at a county-
wide election called for such purpose.'

"There are also provisions in the Public
Health statutes, such as Article 4418f, author-
izing the expenditure by the Commissioners'
Court of County funds for public health and
sanitation.  Article 5823 authorizes the Com-
missioners' Court and the council of any city
or town to appropriate and expend money for
the expenses of troops, batteries, companies,
signal corps, hospital corps, and bands of the
active militia of this State located in such
counties, cities, or towns, not to exceed the
sum of $100 per month for the expense of any
one organization.  Article 5891a authorizes the
County Commissioners' Court, city authorities,
communities, and civic and patriotic organiza-
tions to provide funds, armories, equipment,
material, transportation, or other appropriate
services or facilities, to the Texas Defense
Guard.  There is also Article 6144 providing
for a 'Home Guard.' This latter statute seems
to contemplate the organization of a guerrilla
band which will be authorized, or the members
of which will be authorized, to carry pistols
and other weapons when 'called to actual duty
by the sheriff.' The act provides that 'coun-
ties, cities, and towns may through their law-
ful governing bodies appropriate from their pub-
lic treasuries, moneys to provide arms and am-
munition for such Guard under such rules as they
may prescribe, and those receiving arms from the
county shall return all guns and ammunition to
the county judge when not on duty.' The type
of expenditure authorized by these various stat-
utes is very similar to the type of expenditure
now proposed to be made and about which the above
questions are propounded.  The fact that the Leg-
islature found it necessary to pass statutes

542

specifically authorizing the Commissioners'
Court to make expenditures of the types above
noted impels the necessary conclusion that with-
out such statutes the Court would have no au-
thority to make such expenditures.

"So far as I have been able to learn there
is no statute specifically authorizing any ex-
penditure in connection with the 'Office of
Civilian Defense' of any of its branches. Our
Courts have repeatedly said in the past that
the powers of the Commissioners' Courts and of-
ficers of counties are limited to those express-
ly granted to them by the Constitution and stat-
utes, and such powers as are necessarily implied
from those expressly granted.

"Wills County vs. Lampasas County, 40 S.W.
552, 90 Texas 603;

"Commissioners' Court of Madison County vs.
Wallace, et al, 15 S. W. (2) 535;

"Von Rosenberg, et al.vs. Lovett, 173 S.W.
508 (Error Refused);

"Commissioners' Court of Harris County vs.
Kaiser, et al., 23 S. W. (2) 840 (Error Refused);

"City of Breckenridge vs. Stephens County,
(Commission of Appeals) 120 Texas, 318, 40 S.W.
(2) 43;

"Nunn-Warren Publishing Company vs. Hutch-
inson County, 45 S. W. (2) 651 (Error Refused);

"Hogg vs. Campbell, et al., 48 S. W. (2)
515; and,

"Landman vs. State, 97 S. W. (2) 264 (Error
Refused).

"It is generally recognized that the Com-
missioners' Court may act through agents for cer-
tain purposes, although their authority to so
act seems somewhat limited by the statutes. Ar-
ticle 1580, Revised Civil Statutes, 1925. The

Legislature may commit county business to some
other agency than the Commissioners' Court.
Austin Bros. vs. Patton, et al, (Commission of
Appeals), 288 S. W. 182. But apparently the
authority of the Commissioners' Court to dele-
gate its authority is very limited. Thus it
has been held that the duty of the County Com-
missioners to audit all claims against the coun-
ty and to order paid only those found to be just,
is judicial and its performance cannot be dele-
gated to another. Padgett, et al. vs. Young
County, et al., 204 S. W. 1046, (Error dismissed,
229 S. W. 459). Presumably the same rule would
apply to me, as County Auditor, in the discharge
of duties imposed upon me by such statutes as
Articles 1660, 1661, and Subsection L, Section
19, of Article 3912e.

"There are numerous provisions of our Con-
stitution disclosing a general policy of confin-
ing the expenditure of tax funds to stated public
purposes, and specifically denying even to the
Legislature authority to contribute those funds
to purposes other than those for which they were
created. See: Article III, Sections 44, 51, 52,
and 53; Article I, Sections 3 and 16; and Arti-
cle XVI, Section 6. Our Supreme Court has also
expressly declared that County Commissioners'
Courts have no authority to transfer money from
a fund created for one purpose to a fund created
for some other purpose. Carroll, et al. vs. Williams,
County Treasurer, et al, 109 Texas 155, 202 S.W.
504.

"I do not understand that the Governor, in
his designation of the County Judge, has in any
sense undertaken to authorize the expenditure of
any funds for any purpose. The Governor is, of
course, given somewhat broad authority by the ex-
press provisions of Section 7, Article IV, of
the Constitution, which reads:

"'He shall be Commander-in-Chief of the
military forces of the State, except when they
are called into the actual service of the United
States. He shall have power to call forth the
militia to execute the laws of the State, to
suppress insurrections, repel invasions, and
protect thefrontier from hostile incursions by
Indian or other predatory bands.'

"Any expenditures which might be undertaken
in connection with the above section of the Con-
stitution, or any other section of the Constitu-
tion authorizing the Governor to act, would not,
so far as I am informed, give the Governor any
authority to authorize county officers to spend
money from county funds in the furtherance of
the ends so authorized. It seems to me that such
activities on the part of the Governor must nec-
essarily be financed from appropriations made
by the Legislature, or under some act of the Leg-
islature specifically authorizing the Commission-
ers' Court, or other county officers, to spend
money in aid of activities undertaken by the
Governor under constitutional authority.

"It seems further apparent to me from the
executive order promulgated by the President
creating the Office of Civilian Defense that
it was contemplated that the Federal Government
would defray the actual expenses incident to
the setup of that organization. The order seems
to contemplate the States as units in the Civil-
ian Defense authority. Of course, counties are
declared by our Constitution to be legal sub-
divisions of the State. Article XI, Section 1,
I understand the rule to be that Commissioners'
Courts are without any legislative powers what-
soever, and, as the governing bodies of sub-
divisions of the State, must rely upon the Leg-
islature for authority to expend funds. I have
been unable to find any authority for the ex-
penditure proposed in this instance, either in
the form of a direct authorization by the Leg-
islature, or in the form of an implication in
existing statutes. I have enumerated certain
statutes above from which it might be said that
certain powers could be inferred, but I do not
believe that they are broad enough to authorize
expenditures of the type here proposed.

"I, therefore, respectfully submit for your
determination the questions above enumerated,
and have appended the citation of authorities
and discussion in the hope that they will be of
some assistance in properly determining the ques-
tions submitted.

"A recent opinion of your department which seems to me to have some bearing upon one phase of the question presented is your Opinion O-4483, dated March 16, 1942, addressed to Honorable Burl Brittain, County Auditor, San Patricio County, Sinton, Texas, in regard to the payment of expenses of the County Judge incurred as Coordinator of Civilian Defense."

We thank you for the excellently written opinion contained in your letter. Since you accurately state the law as we understand it, we adopt the views expressed by you as the opinion of this Department. It follows that your first and fourth questions are answered in the negative, and your second and third questions do not require an answer.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By　　　*R. W. Fairchild*

R. W. Fairchild
Assistant

RWF:LM

APPROVED APR 23, 1942

*Gerald C. Mann*

ATTORNEY GENERAL OF TEXAS

